11-5384-cr
United States v. Douglas

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: December 19, 2012    Decided: April 15, 2013)

Docket No. 11-5384-cr

UNITED STATES OF AMERICA,

*Appellee*,

— v. —

CAMERON DOUGLAS,

*Defendant-Appellant*,

KELLY SOTT, EDUARDO ESCALERA, DAVID ESCALERA,

*Defendants*.

B e f o r e:

CALABRESI, LYNCH, and CHIN, *Circuit Judges*.

Appeal from a December 21, 2011, judgment of the United States District Court for the Southern District of New York (Richard M. Berman, *J.*) sentencing defendant to 54 months' imprisonment for possession of controlled substances while an inmate of a federal prison.  Defendant contends that the district court's above-guidelines sentence was substantively unreasonable.  The district court's sentence was substantively reasonable in light of the particular facts of defendant's case.

AFFIRMED.

---

PAUL L. SHECHTMAN (Nicholas M. De Feis, Allison S. Menkes, De Feis O'Connell & Rose, P.C., New York, New York, *on the brief*), Zuckerman Spaeder LLP, New York, New York, *for defendant-appellant*.

JUSTIN ANDERSON (Katherine Polk Failla, Assistant United States Attorney, *on the brief*), Assistant United States Attorney, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, *for appellee*.

Daniel N. Abrahamson, Theshia Naidoo, Tamar Todd, Drug Policy Alliance, Berkeley, California, *for amici curiae New York Society of Addiction Medicine, American Academy of Addiction Psychiatry, California Society of Addiction Medicine, American Association for the Treatment of Opioid Dependence, Center for Prisoner Health and Human Rights, Osborne Association, National Alliance for Medication Assisted Recovery, Exponents, The Legal Action Center, International Doctors for Healthy Drug Policy, Dr. Robert G. Newman, Dr. Beny Primm, Dr. David Lewis, Dr. Josiah D. Rich, Dr. Joshua Lee, Dr. Ernest Drucker, Dr. Joyce H. Lowinson, Dr. Sharon Stancliff, Dr. Peter Banys, Dr. Bruce Trigg, Dr. Carl Hart, Dr. Daliah Heller, and Dr. Herman Joseph, in support of defendant-appellant*.

GERARD E. LYNCH, *Circuit Judge*:

This case requires us to decide whether a significantly above-guidelines sentence may be imposed in view of earlier sentencing leniency that turns out, after the fact, to have been unjustified. We conclude that above-guidelines sentences must be justified by reference to specific reasons that place the case outside the run of ordinary cases, and that the further the sentence departs from the typical sentence imposed for the conduct of conviction, the greater the justification that is required. In the particular circumstances of this case, we conclude that defendant's sentence was reasonable.

## BACKGROUND

### I. Douglas's 2009 Arrest and Prosecution

From 2006 to 2009, Cameron Douglas distributed methamphetamine and cocaine on behalf of suppliers in California. During that time, he was addicted to heroin and relied on the proceeds of his illegal activity to satisfy his habit. Douglas was arrested for his part in the distribution ring on July 28, 2009. After his arrest, he was taken to a hospital and treated for heroin intoxication before being taken to prison.

Shortly after his arrest, Douglas agreed to cooperate with the government by testifying against his suppliers, Eduardo and David Escalera. After he agreed to cooperate, Douglas was released from custody and placed under house arrest. While on

3

home detention, he convinced his girlfriend, Kelly Sott, to bring him heroin hidden inside an electric toothbrush. When the heroin was found, Douglas's bail was revoked and he was remanded to the Metropolitan Correctional Center ("MCC") in New York.

Douglas pled guilty to a two-count superseding information on January 27, 2010. The information charged him with conspiracy to distribute methamphetamine and cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), which carried a ten-year mandatory minimum sentence, and with misdemeanor possession of heroin, in violation of 21 U.S.C. § 844 and 18 U.S.C. § 3147, for the incident that occurred while he was on pretrial release. Because the government believed that the Escaleras might have left the country when news of Douglas's arrest was made public by an online publication, the prosecutors agreed to allow Douglas to be sentenced before he testified against his suppliers.

The guidelines sentencing range for Douglas's conduct was 151 to 188 months' imprisonment. In his sentencing memorandum, Douglas described his struggles with drug addiction and his privileged but troubled upbringing. In view of his addiction, Douglas asked the court to impose a sentence of time served or, alternatively, a sentence of forty-two months' imprisonment, which would have allowed Douglas to enter the Bureau of Prisons ("BOP") Residential Drug Abuse Program ("RDAP") immediately.[1]

---

[1] The Ninth Circuit has helpfully described the RDAP program. See Close v. Thomas, 653 F.3d 970, 972 (9th Cir. 2011); Reeb v. Thomas, 636 F.3d 1224, 1225 (9th

4

The government characterized Douglas's cooperation as "tremendously valuable" and stated its intention to file a motion pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 to authorize the district court to depart downward from the mandatory minimum sentence of ten years' imprisonment.

Douglas appeared for sentencing on April 20, 2010. At sentencing, the government did not recommend any particular sentence, but it did file the departure motion. The district court (Richard M. Berman, *Judge*) discussed the many letters submitted by Douglas's parents, former teachers, friends, and supporters expressing the view that Douglas had finally "bottomed out," and was resolved to overcome his addiction and disregard for legal constraints. The district judge noted that he thought "this case and this sentencing may well be [Douglas's] last chance to make it." April 20, 2010, Sentencing Tr. at 9. The district court imposed a sixty-month sentence of incarceration followed by a five-year period of supervised release.

_____

Cir. 2011). Additional information can be found on the BOP website. See Federal Bureau of Prisons, Substance Abuse Treatment, http://www.bop.gov/inmate_programs/substance.jsp (last visited April 4, 2013).

## II.    Douglas's Additional Conduct

Unbeknownst to the district court (and to the prosecutors handling his case) at the time of his first sentencing, Douglas had recently been discovered to be in possession of contraband yet again. While in BOP custody, Douglas had convinced one of his attorneys – with whom he had begun a romantic relationship – to smuggle approximately thirty unprescribed Xanax pills to him in the MCC. He took some of the pills himself and provided others to other inmates. This additional misconduct came to the attention of the prosecutors only when they were asked to enter an immunity agreement covering Douglas's uncharged criminal activity to facilitate his testimony against the Escalera brothers, who by that point had been located and arrested. Notwithstanding the Xanax incident, on October 4, 2011, Douglas testified against David Escalera, who was convicted by a jury and later sentenced to 120 months' imprisonment.

However, less than two weeks after the completion of David Escalera's trial, and before the scheduled separate trial for Eduardo Escalera, Douglas was found in possession of contraband for a third time while incarcerated or under supervision. On October 16, a BOP staff member suspicious of window coverings in Douglas's cell and Douglas's furtive movements searched his person and cell and discovered a piece of paper with traces of white powder on it as well as a small amount (0.028 grams) of an orange rock-like substance. Later testing showed the rock-like substance to be Suboxone, a drug used to treat heroin addiction, for which Douglas did not have a prescription.

Although lab analysis of the powder on the paper was inconclusive, Douglas later admitted the substance was heroin. After submitting to urinalysis, Douglas also tested positive for opiates. Douglas told prosecutors that he had found the heroin either in the television room or in the chapel. He told the government that he had not sought out the heroin and that it was not originally intended for him.

Four days later, on October 20, the government filed an information charging Douglas with one count of possession of a prohibited object while an inmate of a federal prison, in violation of 18 U.S.C. § 1791(a)(2) and (b)(1). The same day, pursuant to a plea agreement, Douglas pled guilty. The agreement stipulated that Douglas's offense level under the sentencing guidelines was 11 and that his Criminal History Category was III. After giving Douglas credit for acceptance of responsibility, the agreement calculated his guidelines sentence range as twelve to eighteen months' imprisonment. The agreement preserved the government's right to seek an enhancement for obstruction of justice if Douglas had "engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice."

In its Presentence Report ("PSR") to the district court, the Probation Office recommended a sentence of 366 days' imprisonment. According to the Probation Office, that recommendation was shorter than it might otherwise have been in light of administrative sanctions already imposed on Douglas, which included eleven months' disciplinary segregation in the Special Housing Unit and eighty days' canceled "good

7

conduct" credit toward his early release.  However, the PSR was submitted before the Probation Office learned that Douglas had misled the government about how he obtained the heroin.  After Douglas entered his plea but before he was sentenced, another MCC inmate (a cooperating witness in another case) informed the government that Douglas had not found the heroin on the ground but instead had bought it from him.  In short, Douglas had not only purchased heroin while in prison, he had lied to prosecutors in an effort to mislead them about the seriousness of his conduct.  As a result of this deception, the government elected not to call Douglas as a witness at the trial of Eduardo Escalera.

At sentencing, Douglas urged the district court not to impose additional punishment beyond the administrative sanctions he had already received.  Additionally, he urged the court to consider his seven-year history of drug addiction as a mitigating factor because his conduct was best explained not by a desire to break the law but by the effects of, among other things, Opioid Protracted Abstinence Syndrome ("OPAS").[2]  The

---

[2] Dr. Carol J. Weiss, a psychiatrist who provided an expert report to the district court discussing Douglas's mental health issues, described OPAS as "a phenomenon well documented in the medical scientific literature" that "is the primary cause of relapse in long term opioid users."  As Dr. Weiss described it, OPAS is caused by the long-term chemical deficiency that results from the damage done by heroin to the body's ability to produce natural opioids.  This altered neurochemical state, which has been characterized as a "brain-related disorder with genetic and environmental overlays characteristic of a medical illness," can increase the probability of relapse years after detoxification.  See Herbert D. Kleber, Methadone Maintenance 4 Decades Later, 300 J. Am. Med. Ass'n 2303, 2304 (2008); Jordi Camí & Magí Farré, Drug Addiction, 349 New Engl. J. Med. 975, 983 (2003).

best solution to his problems, he argued, was not punishment but treatment. Because he was approaching the eligibility period for RDAP treatment at the time of his offense, Douglas urged the court not to add time to his sentence, which would prolong the time before he could enter that program. Finally, Douglas noted the relative rarity with which drug possession in prison was prosecuted criminally and the small amount of drugs he had possessed.

The government's sentencing memorandum urged the district court to apply a two-level obstruction-of-justice enhancement, pursuant to U.S.S.G. § 3C1.1, an adjustment that would have raised Douglas's guidelines sentencing range to 18 to 24 months' imprisonment. The government asked the district court to impose a sentence "at the high end" of the guidelines range in view of what it characterized as Douglas's "repeated inability to conform his conduct to the law, his demonstrated disrespect for the criminal justice system, his decision to provide false information to the Government, and the seriousness of the offense." Gov't Sentencing Mem. at 4-5.

The district court sentenced Douglas on December 21, 2011. At the outset, the district court noted that Douglas had "been continuously reckless, disruptive and non-compliant." Sentencing Tr. at 4. The district court applied the obstruction-of-justice enhancement requested by the government and also denied Douglas the benefit of the acceptance-of-responsibility credit. The district court therefore calculated Douglas's sentencing guidelines range as twenty-four to thirty months' imprisonment.

Based on its review of the factors set forth in 18 U.S.C. § 3553(a), the district court determined that there were grounds to impose a more severe sentence than that recommended by the guidelines. The district court focused on several factors: Douglas's "history of reckless behavior," his "extensive substance abuse and mental health issue history," and his "continued pursuit of drugs." Sentencing Tr. at 12-13, 15. The district court also described the Xanax and Suboxone incidents, noted that it had been unaware of the former at the time of Douglas's first sentencing, and criticized both defense counsel and the government for sweeping those facts "under the rug." Sentencing Tr. at 16. The district court characterized the original, sixty-month sentence it imposed on Douglas as "the biggest opportunity of his life," which Douglas had "blown." Sentencing Tr. at 18. After considering the administrative sanctions already imposed by the BOP and hearing argument from both sides, the district court imposed a sentence of fifty-four months' imprisonment, to be followed by three years of supervised release. The court noted that it believed an upward variance was appropriate because of Douglas's "pattern of reckless, criminal, dangerous, destructive, deceitful conduct even after being afforded a last chance" by the court's prior sentence. Sentencing Tr. at 57. In support of its decision to impose an above-guidelines sentence, the district court cited United States v. Rossi, 422 F. App'x 425 (6th Cir. 2011) (unpublished opinion), United States v. Nix, 415 F. App'x 981 (11th Cir. 2011) (unpublished opinion), and United States v. Pope, 554 F.3d 240 (2d Cir. 2009).

10

On December 23, 2011, Douglas filed a timely notice of appeal.

## DISCUSSION

### I.     Principles

Our review of the reasonableness of a district court's sentence "encompasses two components: procedural review and substantive review." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Here, Douglas argues only that his sentence was substantively unreasonable.[3] We review the substantive reasonableness of a district court's sentence for abuse of discretion, and we "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." Gall v. United States, 552 U.S. 38, 51 (2007). We set aside a district court's sentence as substantively unreasonable only if affirming it "would . . . damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." United States v. Rigas, 583 F.3d 108, 123 (2d Cir. 2009).

---

[3] Although some parts of Douglas's brief could be read as arguing that the district court's sentence was procedurally unreasonable because the district court erred in concluding that Douglas was not eligible for the acceptance-of-responsibility credit, his counsel conceded at oral argument that he was not making that argument on appeal. In any event, the argument lacks merit. The district court's factual findings regarding Douglas's acceptance of responsibility were not clearly erroneous, and its denial of the adjustment was entirely reasonable under the circumstances.

In conducting this analysis, we are mindful of the fact that the Sentencing

Guidelines are just that, guidelines, and that "they are truly advisory." Cavera, 550 F.3d

at 189. We have previously declined to adopt a presumption of reasonableness for

sentences that fall within the guidelines range. United States v. Fernandez, 443 F.3d 19,

27 (2d Cir. 2006). Instead, we have opted for a more flexible approach that allows

consideration of the facts of an individual case. As a way to guide this analysis, we have

used as our lodestar the parsimony clause of 18 U.S.C. § 3553(a), which directs

sentencing courts to "impose a sentence sufficient, but not greater than necessary to

comply with" the factors set out in 18 U.S.C. § 3553(a)(2). United States v. Dorvee, 616

F.3d 174, 183 (2d Cir. 2010). Those factors are, broadly speaking, proportionality,

deterrence, incapacitation, and rehabilitation.

We evaluate whether an above-guidelines sentence represents an abuse of

discretion based on the reasons given by the district court when imposing the sentence.

United States v. Sindima, 488 F.3d 81, 85-86 (2d Cir. 2007). Indeed, the requirement that

sentencing judges "articulate their reasons . . . is a precondition for meaningful appellate

review." Cavera, 550 F.3d at 193 (internal quotation marks and citation omitted). And

although we may not rely on any sort of "rigid mathematical formula that uses the

percentage of a departure as the standard for determining the strength of the justifications

required for a specific sentence," Gall, 552 U.S. at 47, the extent of the departure from the

typical sentence for the type of crime at issue is a significant factor in determining how

12

compelling the sentencing court's reasons must be.  See id. at 51 (indicating that the question is whether the reasons given under the § 3553(a) factors "justify the extent of the variance" from the guidelines); see also United States v. Bradley, 675 F.3d 1021, 1025 (7th Cir. 2012).

## II.    Application

Douglas argues that his sentence is substantively unreasonable because it was well above the guidelines range and because it appears to have been substantially higher than those imposed on other defendants caught engaging in the same behavior.  At the outset, Douglas argues that criminal prosecutions for violations of § 1791 are rare, and that most prisoners apprehended in possession of contraband are dealt with entirely by BOP administrative sanctions, without criminal prosecution.  Accordingly, he argues, the median punishment for such conduct is no additional criminal punishment at all, but rather administrative sanctions of the sort Douglas had already received.  Assuming without deciding that a district court may take patterns of prosecutorial discretion into account in determining an equitable sentence that avoids unwarranted disparities among similarly situated offenders, an appellate court is ill placed to assess whether a defendant is in fact situated similarly to others whose circumstances, because they were never prosecuted, are unknown to us.  The relative infrequency of prosecution of prisoners found with contraband therefore does not count heavily against the reasonableness of the sentence in this case.

13

More compelling is Douglas's evidence regarding the sentences typically imposed for similar crimes in this Circuit. In his brief, Douglas reviews all cases in this Circuit since 1990 in which a defendant was charged with violating 18 U.S.C. § 1791. He lists fourteen cases, none of which resulted in a sentence longer than thirty-seven months' imprisonment. The longest sentence was the one we affirmed in United States v. Mills, 66 Fed. App'x 273 (2d Cir. 2003) (summary order). That case, as Douglas points out, presented several aggravating circumstances. Mills involved his three young children, all under the age of eight, and his seventy-one-year-old mother in a scheme to smuggle two balloons full of controlled substances into prison by swallowing them.[4] Mills also had a higher criminal-history category (VI) than Douglas does (III), yet he received a sentence that was not only lower than that imposed on Douglas, but was also in the middle of Mills's guidelines range. Given these differences between the harshest sentence imposed in this Circuit in the last twenty-three years for the crime Douglas committed and the facts of his case, Douglas argues that his sentence is unsupported by the district court's reasons.

The government does not contest that Douglas's sentence is the longest ever imposed for a violation of 18 U.S.C. § 1791 in this Circuit, nor does it question the

---

[4] We note that while Mills's use of his children in his scheme may shock our sensibilities, Douglas also callously involved in his criminal schemes others with whom he had close relations, including his girlfriend and an attorney with whom he was romantically involved, with serious consequences to both.

14

completeness of Douglas's survey. Instead, it argues that Douglas's sentence was adequately supported by the reasons given by the district court, namely that the district judge had never seen a defendant who, in his words, had "so recklessly and wantonly and flagrantly and criminally acted in as destructive and [as] manipulative a fashion as Cameron Douglas has," Sentencing Tr. at 18, and that the district court gave adequate consideration to Douglas's need for treatment and the administrative sanctions already imposed by the BOP. The government also argues that Douglas's sentence was reasonable in light of the fact that he had been accorded striking leniency at his original sentencing but betrayed the promises in his cooperation agreement and engaged in a pattern of criminal conduct both before and after that sentencing in ways that the district court had not known when it imposed a reduced sentence.

We agree with Douglas that his sentence was extraordinary. But so are the facts of his case, which differ in significant ways from those of the other cases surveyed by the defense. His original, sixty-month sentence was five years shorter than the applicable mandatory minimum, and more than seven-and-a-half years below the sentence recommended by the guidelines for the criminal behavior to which he pled guilty. As he points out, the reduced sentence was in part a reward for his cooperation. But reduced sentences for cooperation are only *partially* a quid pro quo for assistance to the government. Cooperators also receive reduced punishment in part because their willingness to assist the government can signify a renunciation of criminal associations

15

and the beginning of a new life. Douglas capitalized on this rationale when he and his supporters emphasized to the district court at his original sentencing that he had indeed turned a corner in life and was resolved to reform.

That promise, as it turned out, was already tainted. Even at the time of his first sentence, unbeknownst to the court, Douglas had already engaged in further criminal acts while in custody. Moreover, even if the district court had overlooked that conduct, Douglas received his dramatic downward departure from the recommended guidelines sentence largely because he was lucky enough to be sentenced before he testified against his suppliers – which he never fully did. Before Douglas completed his expected cooperation, he breached his commitment to the government by engaging in further drug-related conduct and by lying about it to prosecutors, destroying his further value as a witness. Had Douglas not been sentenced on his original guilty plea until after testifying, as is the typical practice in this Circuit, the discovery of his further offense would have permitted the government to revoke his agreement and decline to file a departure motion. Had that occurred, as we have every reason to expect it would have, the *minimum* sentence Douglas could have received – even without *any* additional prosecution for his possession of heroin in prison – would have been 120 months, six months more than the combined sentences he actually received.

Moreover, Judge Berman noted at Douglas's first sentencing that it represented his "last chance to make it." When combined with the additional conduct the district court

learned of only after the first sentence – like the Xanax incident and the fact that Douglas was not forthcoming about how he obtained the contraband heroin and Suboxone – the facts of Douglas's case are sufficiently unusual, and sufficiently more serious, to permit the district court to make a substantial upward variance from the recommended guidelines range. On this record, we cannot conclude that the district court abused its discretion by sentencing Douglas to an aggregate prison sentence that was still shorter than the mandatory minimum sentence applicable to his underlying offense, which would very likely have been required but for accidents of timing. See United States v. Verkhoglyad, 516 F.3d 122, 130 (2d Cir. 2008) (upholding an above-guidelines sentence imposed in view of numerous probation violations); United States v. Pelensky, 129 F.3d 63, 69-70 (2d Cir. 1997) (upholding a statutory maximum thirty-six-month sentence, despite a guidelines range of five to eleven months, because of defendant's "dismal track record on supervised release," including failure to complete drug treatment and disregard for court orders).

Finally, we take note of the argument, made by Douglas and supported by amici, that punitive sanctions are a less appropriate response to criminal acts by persons suffering from addiction than drug treatment. It may well be that the nation would be better served by a medical approach to treating and preventing addiction than by a criminal-justice-based "war on drugs." See, e.g., Heather Schoenfeld, The War on Drugs, the Politics of Crime, and Mass Incarceration in the United States, 15 J. Gender Race &

17

Just. 315 (2012); Juan R. Torruella, <u>Déjà Vu: A Federal Judge Revisits the War on Drugs, or Life in a Balloon</u>, 20 B.U. Pub. Int. L.J. 167 (2011). But Congress has made a different choice, and this case is not a vehicle for deciding questions of comprehensive drug policy. For so long as the sale and possession of narcotics remain crimes, courts must struggle with the difficult task of sentencing those who commit such crimes.

We do not hold that district courts may not approach cases of addicted defendants who seek treatment and show promise of changing their lives with compassion and with due consideration of the relative costs and effectiveness of treatment versus long prison sentences. Indeed, that is precisely how the district court approached Douglas's original sentence in this case. Sentencing courts are not required, however, to turn a blind eye to behavior that can reasonably be understood as demonstrating that a particular defendant has shown himself to be a poor candidate for treatment or for leniency. District courts are in the best position to decide whether the defendant before the court is likely to respond to drug treatment or has spurned chances at rehabilitation and persisted in a life of "reckless, criminal, dangerous, destructive, [and] deceitful conduct." We therefore cannot say that the district court's assessment of the sentence appropriate for Douglas was unreasonable.

## CONCLUSION

Because of the peculiar facts of this case, the district court gave sufficient reasons to support its unusually long sentence in this case. We therefore affirm the judgment of the district court.

18

CALABRESI, *Circuit Judge*, concurring:

I join the majority opinion in full because I agree that it is not substantively unreasonable for a district judge, after having given a defendant a number of breaks and second chances, to impose a sentence like this one. I write separately to emphasize my view that a term of imprisonment of between 5 and 10 years ought not to be seen merely as a punishment. It also must represent an expression of some faith that the convict might be rehabilitated within that time. Prisons should have a duty, therefore, not just to keep the convict locked away, but to enhance his ability to become a responsible citizen. When the convict's crime involves drug addiction, a necessary part of this rehabilitation is enforced, medically monitored withdrawal. Congress has passed a law criminalizing possession of drugs by an inmate in federal prison, and there is no question that Douglas broke that law and manifested, as the majority opinion shows, a high level of culpability. There is also no question in my mind, however, that the incidence of this crime also demonstrates a significant level of culpability on the part of the jailing institution.[1] When a prison cannot protect an addicted inmate from the capacity to relapse, it has failed to perform an essential obligation – an obligation that it owes both to the inmate and to the society that the inmate will someday rejoin.

---

[1] During his first sentencing hearing, Judge Berman imposed a 60 month sentence, and recommended that Douglas be allowed to participate in the Bureau of Prisons ("BOP") Residential Drug Abuse Program. But under BOP policies, an inmate may only enter that program when he has 42 months or less left on his sentence. Upon entry, Douglas would only be eligible for the BOP's "Drug Abuse Education" program, which the BOP describes as "not drug abuse treatment." Federal Bureau of Prisons Annual Report on Substance Abuse Treatment Programs Fiscal Year 2011, at *5, available at http://www.bop.gov/inmate_programs /docs/annual_report_fy_2011.pdf (last accessed April 1, 2013). In 12 weeks preceding his admission to the Residential Drug Abuse Program, Douglas might also be able to participate in "Nonresidential" Drug Abuse Treatment, a group and cognitive behavioral therapy program. Federal Bureau of Prisons, Drug Abuse Treatment, available at www.bop.gov/inmate_programs/substance.jsp/ (last accessed April 1, 2013). This case, then, is about an addict who would not be eligible for treatment for his addiction for more than a year, and who was, at the same time, exposed to a flourishing drug trade within the walls of the prison.

I underscore what is suggested in the last paragraphs of the majority opinion, that Congress's choice to make the use of drugs, and that use in prison, crimes, is highly problematical. No one has made the argument that this is an unconstitutional penalty imposed upon Douglas because of his status as an addict, and I believe no such argument can convincingly be made. *Cf. Robinson v. California*, 370 U.S. 660 (1962). As a result, our Court has no authority to stand in the way of the operation of this law, even though our experience with such cases may lead us to think it is counterproductive. And so we must affirm the district court and enforce that law.

We can, however, make observations based on our experience. This law and laws like it require district courts to confront a vexing question every day: how to treat addicts who have suffered a relapse. We are not permitted to treat this question as a medical one, although, in some sense, it is. We dismiss Douglas's argument that he should be treated as a victim of his drug abuse, rather than as a criminal, both because that is not a legal argument, and because it seems to ask us to treat him differently from the thousands of other addicts we see every year. But it remains true that these defendants are all victims. The multiple costs of our imprisonment approach – including the expense of filling our prisons with drug addicts, to mention just a base economic cost – impel me to express the hope that Congress may some day seek out a different way of dealing with this problem.