**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Julian Alexander ZUK, Defendant–**
**Appellee.**

**No. 16-4727**

United States Court of Appeals,
Fourth Circuit.

Argued: September 13, 2017

Decided: October 24, 2017

ARGUED: Amy Elizabeth Ray, Office of the United States Attorney, Asheville, North Carolina, for Appellant. Andrew Brady Banzhoff, Devereux & Banzhoff, PLLC, Asheville, North Carolina, for Appellee. ON BRIEF: Jill Westmoreland Rose, United States Attorney, Office of the United States Attorney, Charlotte, North Carolina, for Appellant.

Before WILKINSON, Circuit Judge, NIEMEYER, Circuit Judge, and Raymond A. JACKSON, United States District Judge for the Eastern District of Virginia, sitting by designation.

Vacated and remanded by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge Jackson joined.

NIEMEYER, Circuit Judge:

In this appeal, the government challenges as substantively unreasonable the sentence imposed by the district court on Julian Zuk.

Zuk was indicted on seven counts for transmitting, receiving, and possessing child pornography. The undisputed evidence shows that before his arrest, Zuk amassed more than 13,800 photographs and more than 470 videos, a large proportion of which depicted the sadistic treatment of young children. He also communicated on a daily basis with a 16-year-old who was sexually abusing his 5-year-old cousin and even directed the 16-year-old to abuse the child in specific, sadistic ways. Pursuant to a plea agreement, Zuk pleaded guilty to one count of possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). Because the Sentencing Guidelines' recommendation for Zuk's relevant conduct substantially exceeded 240 months' imprisonment, which was the maximum sentence for possession, the 240-

month term became the Guidelines' recommended sentence.

Following a lengthy sentencing hearing during which Zuk's recently diagnosed autism spectrum disorder was explained, the district court sentenced Zuk to time served of 26 months, reciting Zuk's disorder as the "primary driver" behind the sentence. On appeal, the government states:

> The time-served sentence Zuk received is substantively unreasonable because it creates unwarranted sentence disparities and fails to provide just punishment or adequate deterrence in light of the seriousness of Zuk's offense conduct. Zuk is a pedophile, a sadist, and a recidivist who possessed more than 13,000 images of child pornography and who directed a 16-year-old boy's sexual abuse of his five-year-old cousin for Zuk's sexual gratification. Yet Zuk's time-served sentence is lower than the sentence advised by the Sentencing Guidelines for a child-pornography-possession offense with *no* aggravating factors.

Because we agree with the government in the particular circumstances of this case, we vacate the district court's sentence and remand for resentencing.

## I

When Julian Zuk was a high-school sophomore in Asheville, North Carolina, he found a photo-sharing website that hosted images of nude minors and minors in bondage. Using a school laptop and a flash drive, he began to view and download these images, and he continued to do so through his junior and senior years of high school. After graduating in the middle of his high school class, Zuk enrolled at Appalachian State University in the fall of 2012. Over the course of his freshman year, he spent an increasing amount of time acquiring child pornography, developing a particular interest in content that depicted the sadistic treatment of prepubescent children. When he realized that he could obtain more illicit material by trading images via email with people he had met online, he created hundreds of different email addresses for that purpose. Among the images that he distributed to other child pornography collectors were several family photographs of his sister taken when she was an infant and young child.

One of the individuals with whom Zuk traded images was "D.J.," a 16-year-old from Texas, who was sexually abusing his 5-year-old cousin. Zuk and D.J. started communicating "daily for at least an hour about abusing the 5-year-old boy." Among the images that D.J. provided to Zuk was a photograph of the boy dressed only in his underwear with his hands and feet bound by white tape, as well as pictures of D.J. giving the child "wedgies," touching him, and "fingering" his anus. In exchange, Zuk provided D.J. with graphic photographs and videos of children, including, for instance, a video of a naked girl under the age of 3, lying on her back with a pacifier in her mouth while a person fondled her vagina. At one point, Zuk instructed D.J. to write Zuk's email address across his 5-year-old cousin's back to prove that the images were real, and he also asked D.J. to produce specific pornographic images of the little boy for his sexual gratification. For instance, in an email dated February 24, 2013, Zuk wrote that he would "love to see: new wedgies[,] him in different tied positions[,] [and] pictures of his different briefs (doesn't have to be wearing them)." In a March 22, 2013 email, Zuk sent D.J. five images depicting boys who were bound with ropes, belts, and other restraints, and he asked D.J. "if [he] would like to do any of these to that cute boy," referring to D.J.'s cousin. When D.J. responded to the images by saying that

they were "nice but they'd be hotter naked," Zuk agreed and stated, "I am guessing you can/will fix that when you take them." Zuk and D.J. eventually discussed the possibility of Zuk visiting Texas, and Zuk began "to research summer internships in the area, under the guise of which he could meet with [D.J.] and participate in or observe the sexual abuse of the young child."

In April 2013, law enforcement agents conducted a "knock and talk" at Zuk's dorm room, and Zuk admitted to possessing and distributing child pornography despite knowing that it was illegal. A search of Zuk's electronic devices and email addresses for child pornography revealed a total of 13,844 photographs and 472 videos, including graphic videos depicting adult men sexually assaulting young children. The collection included pornographic images depicting "infants up to preteen, early teen," and a "large proportion" of it reflected his "interest in sadistic and masochistic conduct."

A federal grand jury returned an indictment in July 2013 charging Zuk with three counts of transporting child pornography, in violation of 18 U.S.C. § 2252A(a)(1); three counts of receiving child pornography, in violation of § 2252A(a)(2); and one count of possessing child pornography, in violation of § 2252A(a)(5)(B). Following his arrest and initial appearance, Zuk was released on bond and went to live with his parents while he received weekly sex-offender treatment from a licensed clinical social worker. Nine months later, however, his parents discovered that Zuk had at some point obtained an iPad that he had used to view child pornography and communicate with minors. Based on these violations of his bond conditions, Zuk was returned to federal custody in June 2014.

Zuk pleaded guilty, pursuant to a plea agreement, to one count of possessing child pornography. In exchange for his guilty plea, the government agreed to dismiss the indictment's six remaining charges, each of which carried a 5-year mandatory minimum sentence. See 18 U.S.C. § 2252A(b)(1). As part of the plea agreement, Zuk "knowingly and expressly waive[d]" his right "to appeal whatever sentence is imposed," unless an appeal was based on a claim of ineffective assistance of counsel or prosecutorial misconduct, and expressly "agree[d] that the United States preserve[d] all its rights and duties as set forth in 18 U.S.C. § 3742(b)," the provision addressing the circumstances in which the government could appeal an otherwise final sentence.

In December 2014, while awaiting sentencing, the district court authorized Zuk's release to Alpha House, a residential sex-offender treatment program in Minnesota, for a three-month psychosexual evaluation. After Zuk returned to federal custody, the district court sent him to the Federal Correctional Institution in Butner, North Carolina ("FCI Butner"), for another evaluation.

During his various pre-sentencing detentions, Zuk was twice assaulted. In the first incident, when Zuk was asleep, a cell mate and another inmate tied him to his bunk with his blanket and, while he was clothed, poked at his buttocks with different objects until they were interrupted by a staff member, leading to the offending inmates' punishment. In the other incident, another inmate "sucker punched" Zuk after he complained that the inmate had changed the television channel. On the whole, however, nothing in the record suggests that Zuk had difficulty adjusting to the structured nature of confinement.

In the presentence report prepared for sentencing, the probation officer applied a cross reference included in § 2G2.2 of the Sentencing Guidelines, as the parties had

agreed in the plea agreement was warranted. That cross reference provided that § 2G2.1, rather than § 2G2.2, generally applies when "the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct." U.S.S.G. § 2G2.2(c)(1). Calculating the recommended sentence, the probation officer began with a base offense level of 32 and applied (1) a 4-level enhancement because the offense involved a minor under the age of 12; (2) a 2-level enhancement because the offense involved the commission of a sexual act or sexual contact; (3) a 2-level enhancement because the offense involved distribution; (4) a 4-level enhancement because the offense involved material portraying sadistic or masochistic conduct or other depictions of violence; and (5) a 3-level reduction for acceptance of responsibility, for a total offense level of 41. For an offense level of 41 and Criminal History Category I, as was the case for Zuk, the recommended sentencing range was 324 to 405 months' imprisonment. But because the maximum term of imprisonment for the crime of possessing child pornography was 240 months' imprisonment, that term became the Sentencing Guidelines' recommended sentence.

In June 2016, the district court conducted a two-day sentencing hearing at which it received testimony from five mental health professionals who had evaluated Zuk after his arrest and from Zuk himself, among others.

Griff Gilbert, a licensed clinical social worker who specialized in evaluating and treating sex offenders, testified that he had been treating Zuk for three years. He stated that he diagnosed Zuk with pedophilia (nonexclusive type), based on Zuk's primary sexual interest in pre-pubescent male and female children and secondary interest in adult females. He also diagnosed Zuk with sexual sadism, a relatively rare diagnosis carried by only 10% of his patients. When Gilbert began treating Zuk, he suspected that Zuk could have had an undiagnosed autism spectrum disorder based on his emotional delays and his poor social skills, but he also noted that Zuk's "[j]udgment and insight were ... fair" and that he knew "the difference between right and wrong." Gilbert concluded that "Zuk was at low risk of a contact offense [with children] and that should he have any reoffending behavior, it was more likely that it would be related to child pornography." While he acknowledged that it was difficult to assess the risk that Zuk would commit another child pornography offense, he offered his view that the risk would be low if Zuk received "correct supervision," treatment in a "therapeutic community," and "support afterwards." Gilbert noted that the brains of young men do not fully develop until they are 25 years old—Zuk was 22 at the time of the sentencing hearing—and opined that the timing of Zuk's treatment was therefore "critical." He also advised against any further prison time for Zuk, offering his view that "low risk offender[s]" like Zuk should not be sent "to a place like prison where there are high risk individuals" and noting his concern that Zuk would be vulnerable in a correctional facility.

Dr. Gary Meisbov, an expert in the diagnosis and treatment of autism, testified that he diagnosed Zuk with autism spectrum disorder in the mild range, as Zuk was highly functioning compared to most people with autism. He explained that, under the previous version of the Diagnostic and Statistical Manual, he would have diagnosed Zuk with Asperger syndrome. Meisbov stated that about 1 in 40 boys were diagnosed with autism spectrum disorder and that people with this diagnosis

often had "trouble with social interaction" based on their "difficulty in understanding perspective" or feeling empathy; had "unusual[ly] intense engagements in certain activities, almost resembling sometimes obsessive behaviors"; and had problems organizing their time and activities. In addition, Meisbov noted that he had previously worked with a number of autistic individuals who had been prosecuted for possessing child pornography and stated that, in his view, there was "a very strong connection" between "autism and . . . some of the unique features of these cases." He stated that, due to their "very limited social skills," these individuals often lack knowledge of appropriate "sexual behavior and interaction"; that they often "don't have a concept that what they're doing is illegal when they get started"; and that their obsessive tendencies and social isolation can lead them to "spend more and more time on the computer" looking at child pornography. In Meisbov's view, Zuk "fit[ ] that pattern . . . very closely" and his "autism spectrum [disorder] contributed to" his offense, even if it was not its cause. Meisbov later acknowledged, however, that he was unaware of certain important aspects of Zuk's offense, including the fact that Zuk had admitted to knowing that his behavior was illegal and wrong.

Dr. Richard Weinberger, the clinical director of Alpha House, testified about the residential treatment program offered there, as well as his evaluation of Zuk. He explained that Alpha House, which had been certified as a minimum security facility by the Minnesota Department of Corrections, was a "therapeutic community" where its residents participated in five hours of group therapy each day, shared house jobs, and supported each other. Residents also received individual therapy on a weekly basis, with all therapy using a cognitive-behavior-based program. Most patients completed Alpha House's residential treatment program in 13 to 18 months, after which they transitioned to a post-residential phase, equivalent to outpatient treatment, for a minimum of 9 months. Alpha House had previously treated at least six autistic offenders, although its staff had no formal training in working with autistic individuals. Weinberger noted that treatment was "easier" with a young person but that "anybody [could] do it."

Testifying about his evaluation of Zuk, Dr. Weinberger agreed that Zuk's offense was "just as likely to have been fueled by his pedophilia" as by his autism. According to Weinberger, "Zuk did not develop close relationships with other residents during his tenure" at Alpha House, and Zuk himself had acknowledged that he sometimes used his "nice guy image" to manipulate others. Zuk also told Weinberger that "lying was a common behavior for him" because it made him " 'feel like [he] could get away with anything.' " The "majority" of Zuk's participation in group therapy was "lackluster" and "minimal," but he made improvements with staff assistance and was "remarkably forthright" about his offending behavior and sexual interests. Based on available research, Weinberger opined that Zuk had a low risk of committing a contact offense but a greater risk of committing an online offense. He was optimistic, however, that Zuk could do well in Alpha House's intensive, long-term treatment program.

The members of FCI Butner's staff who had completed an evaluation of Zuk—Andrew Cheff and Dr. Heather Ross—also testified, stating that they diagnosed Zuk with pedophilic disorder, non-exclusive type; autism spectrum disorder; attention deficit/hyperactivity disorder; sexual sadism disorder; and fetishistic disorder. Dr. Ross testified that the sexual sadism disorder was relatively rare; indeed, to the best of her recollection, Zuk was the first in-

mate she had diagnosed with that disorder in her seven years at FCI Butner. She stated that some research had indicated that contact sex offenders who responded sexually to violent imagery were more likely to reoffend. Nonetheless, based on the current scientific literature and Zuk's specific circumstances, both Cheff and Ross concluded that Zuk "present[ed] a low risk of dangerousness" and was "at low risk for a contact sexual offense," although they allowed that "his risk for viewing child pornography on the internet [might] be greater." They further concluded that his sexual disorders were "in need of treatment as a means of ameliorating his sexual deviance and preventing potential recidivism," recommending that he "receive intensive sex offender specific therapy, which would be available either within the [Bureau of Prisons] through placement at a facility offering [such] treatment or through placement in a community based setting with significant supervision and monitoring of his conduct both on the internet and in daily life." Cheff and Ross noted that the Bureau of Prisons "ha[d] historically provided essential mental health services to inmates presenting with Autism Spectrum Disorder" and observed that, "in spite of his social deficits, Mr. Zuk ha[d] adapted and adjusted well to the correctional environment."

In addition to hearing from these medical professionals about Zuk's condition, the district court also heard testimony from Jennifer Caperton about the sex-offender treatment programs available through the Bureau of Prisons. Caperton was the coordinator of such a program at a federal facility in Texas, where she supervised the treatment of 700 sex offenders. She explained that "inmates who [were] assessed to be at low to moderate risk for reoffending typically [could] participate in a nonresidential treatment program," whereas higher risk inmates were

eligible to participate in the residential program. She indicated that she "would have to look very carefully" at which program was appropriate for an inmate who had "directed the sexual abuse of [a] child." Explaining the programs, she stated that participants in the nonresidential program lived in the general prison population and participated in four to six hours of treatment a week, during which they engaged in group-therapy work that covered basic cognitive-behavior skills before transitioning to a "process group where they work[ed] on disclosing their offenses." They were "assigned to different psycho educational groups based on their risk needs." These inmates were also provided with "any additional services" that they required, which could include individual therapy to work on communication or social skills. Caperton stated that participants in the residential treatment program followed a similar regimen except that the inmates lived together in the same unit, participated in a community meeting every morning, and participated in therapy five days a week, instead of two. Inmates typically began treatment in a nonresidential program when they were 18 months from the end of their sentence, whereas inmates participating in a residential program typically began when they had 27 to 36 months remaining on their sentence.

Caperton testified that individuals on the autism spectrum had successfully completed the Bureau of Prison's sex-offender treatment program and that therapists provided for their needs by using "groups and modules on communication ... and intimacy skills." She explained further that every inmate entering the Bureau of Prisons was evaluated to determine if he might be at "a greater risk for being sexually victimized" and that, for inmates so identi-

fied, the Bureau instituted extra precautions in an effort to keep them safe.

Finally, Zuk testified. He stated that he had benefited greatly from his time at Alpha House and that he had learned there how to "process" his criminal or unhealthy sexual thoughts by talking to another program participant about what a host of people—such as the victim, the victim's family, his own family, and the community—would "think, feel, and do" if they knew he was having a particular thought. He also testified that when he was initially released on bond following his arrest, he thought that he "couldn't be helped," which led him to violate the terms of his release, but that after participating in the Alpha House program, he had learned to believe in himself. Zuk acknowledged the details of his offense, testifying, for example, that having D.J. create "[c]ustom child pornography" for him felt empowering, even though he knew at the time that it was wrong and against the law. He also testified that he did not "naturally feel much empathy for others" and acknowledged a history of lying and being manipulative. But he emphasized that he was determined to take advantage of treatment, whether at Alpha House or the Bureau of Prisons, and that he did not want to reoffend.

After receiving the testimony, the district court heard arguments from counsel. Counsel for Zuk requested that Zuk be sentenced to time served, which, at that point, was 26 months' imprisonment, and to a lifetime term of supervised release, to be conditioned on his successful completion of Alpha House's residential treatment program. The government, in contrast, urged the court to impose the Guidelines' recommended sentence of 240 months' imprisonment.

After receiving supplemental briefing and additional oral argument, the district court announced that it would vary downward by 24 offense levels, from an offense level of 41 to an offense level of 17; impose a term of imprisonment of time served; and impose a lifetime term of supervised release, with the special condition that Zuk successfully complete, at his own expense, the Alpha House residential treatment program, to be followed by 24 months of community confinement. The court explained that "the primary driver of this sentence stem[med] from the defendant's neurodevelopmental disorder, namely, Asperger's syndrome," finding that "the personality aspects that come with that problem," including "a sense of isolation, a social ineptitude factor, [and an] intense absorption in specific topics," had contributed to Zuk's child pornography offense. In the district court's view, the sentence reflected the importance of just punishment, since "'just' [had to] be considered in the light of the defendant's involuntary medical condition." The district court also indicated that Zuk's "extreme vulnerability to violence and bullying in the ... general [prison] population helped shape its sentencing decision." Finally, the court emphasized that its chosen sentence would provide Zuk with "treatment in the most effective manner."

From the district court's judgment, the government filed this appeal, contending that Zuk's time-served sentence of 26 months' imprisonment was substantively unreasonable.

## II

As a threshold matter, Zuk contends that the government's appeal is "barred by an implied appellate waiver," as recognized in *United States v. Guevara*, 941 F.2d 1299 (4th Cir. 1991). He asserts that, under *Guevara*, "when a plea agreement includes an appellate waiver enforceable against the defendant[,] ... [the] pro-

vision must also be enforceable against the Government." Thus, according to Zuk, "despite the Government's inclusion of language [in the plea agreement] attempting to circumvent [this] mutuality requirement, *Guevara* precludes the Government from appealing [his] sentence."

Zuk's reliance on *Guevara*, however, is misplaced. In *Guevara*, the defendant expressly waived the right to appeal her sentence in her plea agreement, but the plea agreement was silent with respect to the government's right to appeal. 941 F.2d at 1299. In those circumstances, we concluded that the government "must be held to have *implicitly*" waived its right to appeal the defendant's sentence, "as the defendant explicitly did," reasoning that it would be "far too one-sided to *construe* the plea agreement to permit an appeal by the government for a fancied mistake by the district court ... but not to permit an appeal on similar grounds by the defendant." *Id.* at 1299–1300 (emphasis added); *see also United States v. Bowe*, 257 F.3d 336, 342 (4th Cir. 2001) ("In *Guevara*, this court held that a plea agreement provision that bars the defendant from appealing, *but is silent as to the Government's right to appeal*, must be construed as imposing a reciprocal limitation on the Government's right to challenge a judgment or sentence imposed by the district court" (emphasis added)).

Unlike the plea agreement at issue in *Guevara*, however, Zuk's plea agreement *expressly* provided that while Zuk "waive[d] all rights" to appeal "whatever sentence [was] imposed," with two limited exceptions, the government "preserve[d] all its rights and duties as set forth in 18 U.S.C. § 3742(b)." Section 3742(b) authorizes the government to seek "review of an otherwise final sentence if the sentence ... was imposed in violation of law" or "is less than the sentence specified in the applicable guideline range," provided that it obtains "the personal approval of the Attorney General, the Solicitor General, or a deputy solicitor general designated by the Solicitor General." 18 U.S.C. § 3742(b). Thus, because Zuk's plea agreement explicitly preserved the government's appellate rights, we conclude that *Guevara* is inapposite.

■ Moreover, to the extent that Zuk invites us to extend *Guevara* and now hold for the first time that the waiver of appeal rights must always be reciprocal in plea bargaining, regardless of the parties' desire to negotiate otherwise, we decline to do so. It redounds to the benefit of both criminal defendants and the government to have flexibility in negotiating the terms of plea agreements, including whether the parties will retain their respective rights to appeal the district court's chosen sentence. Here, for example, the government agreed to seek the dismissal of six counts, the sentences for which could have been stacked and thereby supported a Guidelines sentence in the range of 324 to 405 months' imprisonment, in return for: (1) Zuk's guilty plea to the child-pornography possession offense; (2) his agreement that his advisory sentencing range was properly calculated under the Guideline governing child-pornography production offenses, resulting in a higher base offense level; (3) his agreement to waive his appellate rights; and (4) his agreement that the government preserved its appellate rights. It is far from clear that the government would have elected to strike this bargain—under which Zuk received a substantial benefit, no matter the outcome of this appeal—without Zuk's express agreement that the United States had preserved its right to appeal the district court's sentencing decision. *See United States v. Bradley*, 400 F.3d 459, 464 (6th Cir. 2005) ("[A] plea agreement allocates risk between the two

parties as they see fit. If courts disturb the parties' allocation of risk in an agreement, they threaten to damage the parties' ability to ascertain their legal rights when they sit down at the bargaining table and, more problematically for criminal defendants, they threaten to reduce the likelihood that prosecutors will bargain away counts ...."). Because there is nothing unconscionable or contrary to public policy in permitting a criminal defendant and the government to agree to terms where the defendant waives his appellate rights and the government does not, we refuse to rewrite the parties' plea agreement in this case by striking the provision that allows the government to appeal Zuk's sentence pursuant to § 3742(b). Accordingly, because the plea agreement explicitly preserved the government's appellate rights, we reject Zuk's argument that this "appeal is barred by an *implied* appellate waiver."

## III

■ Turning to the merits, the government contends that the district court abused its discretion in sentencing Zuk to time served of 26 months' imprisonment when the Sentencing Guidelines provided for a sentence of 240 months' imprisonment. It argues that the sentence was substantively unreasonable because it "create[d] unwarranted sentence disparities and fail[ed] to provide just punishment or adequate deterrence in light of the seriousness of Zuk's offense conduct." In particular, it points out that while "Zuk is a pedophile, a sadist, and a recidivist who possessed more than 13,000 images of child pornography and who directed a 16-year-old boy's sexual abuse of his five-year-old cousin for [his own] sexual gratification," his "time-served sentence is lower than the sentence advised by the Sentencing Guidelines for a child-pornography-possession offense with *no* aggravating factors." The government further main-

tains that the district court's heavy reliance on Zuk's autism spectrum disorder in fashioning his sentence was "misplaced," emphasizing that "[t]here is no evidence that Zuk's offenses were caused by his disorder"; that "Zuk is highly functioning in spite of his condition"; and that the "evidence presented to the district court established that Zuk could receive effective treatment within the Bureau of Prisons and that he had adapted well to confinement while awaiting his sentence." At bottom, the government contends that the district court allowed "rehabilitation goals" to "eclipse to ... an extraordinary degree ... the other sentencing objectives [that must be considered] when selecting a *prison* sentence." It urges us to vacate the sentence.

Zuk contends that the district court's sentence was substantively reasonable, arguing that the district court acted within its considerable sentencing discretion when it fashioned an individualized sentence that properly considered (1) how his autism spectrum disorder mitigated his culpability for his conduct and affected his treatment needs; (2) the importance of Zuk's receiving intensive sex-offender treatment in a therapeutic community like Alpha House while his brain was still developing; and (3) his vulnerability in prison due to his autism spectrum disorder and slight frame. Zuk also asserts that the government overstates the extent of the variance because, as the district court recognized, when his time-served sentence of 26 months is added to the time it will take him to complete Alpha House's residential treatment program and the ensuing two years of community confinement, his "sentence will constitute forms of custody totaling upwards of six years." Zuk thus urges us to affirm his sentence.

The governing legal principles are well established. In 18 U.S.C. § 3553(a), Con-

gress provided that district courts must impose a sentence "sufficient, but not greater than necessary, to comply with" the basic purposes of sentencing—namely, "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2); *see also Rita v. United States*, 551 U.S. 338, 347–48, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007) (summarizing § 3553(a)(2)'s purposes as retribution ("just punishment"), deterrence, incapacitation, and rehabilitation). The sentencing court must also consider (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences legally available; (3) the advisory sentencing range provided by the Sentencing Guidelines; (4) any relevant policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities; and (6) the need for restitution. *Id.* § 3553(a).

■ The Sentencing Guidelines' recommended ranges are, of course, advisory, but where the "district court decides that a sentence outside the [Guidelines'] advisory range is appropriate, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States v. Morace*, 594 F.3d 340, 346 (4th Cir. 2010) (quoting *Gall v. United States*, 552 U.S. 38, 50, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)). As such, "[a] major departure from the advisory range 'should be supported by a more significant justification than a minor one.'" *Id.* (quoting *Gall,* 552 U.S. at 50, 128 S.Ct. 586).

■ Appellate review of criminal sentences "is limited to determining whether they are 'reasonable.'" *Gall*, 552 U.S. at 46, 128 S.Ct. 586. Thus, in conducting our review, we must "first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Id.* at 51, 128 S.Ct. 586. If there is no significant procedural error, we must "then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard," taking "into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* In reviewing a sentence outside the Guidelines range, we "give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.* And even though we "might reasonably ... conclude[ ] that a different sentence [is] appropriate," that conclusion, standing alone, is an insufficient basis to vacate the district court's chosen sentence. *Id.* Nonetheless, "inherent in the concept of reasonableness is the notion that the rare sentence may be unreasonable, and inherent in the idea of discretion is the notion that it may, on infrequent occasion, be abused." *United States v. Abu Ali*, 528 F.3d 210, 266 (4th Cir. 2008) (internal quotation marks and citation omitted).

In this case, the district court correctly calculated the recommended Guidelines sentencing range and substantially complied with the other procedural requirements for sentencing. Neither party identifies any significant procedural error. The

issue raised by the government is whether the variance sentence that Zuk received was substantively unreasonable because it fell below that required to make his sentence sufficient to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). The government argues, in other words, that the magnitude of the sentencing variance in this case is not justified by reference to the sentencing factors of § 3553(a).

The Guidelines calculation in this case resulted in a recommended sentencing range of 324 to 405 months' imprisonment. But because the particular offense to which Zuk pleaded guilty had a maximum sentence of 240 months' imprisonment, the final Guideline recommendation was a sentence of 240 months' imprisonment. Thus, when the court sentenced Zuk to time served of 26 months' imprisonment, the downward variance amounted to 214 months, approximately 90 percent of the sentence recommended by the Guidelines. Such an extensive variance, we conclude, is not justified by the consideration that the district court gave to the sentencing factors set forth in § 3553(a).

Notwithstanding the broad scope of the required inquiry, the district court focused almost entirely on Zuk's autism spectrum condition, noting that it was the "primary driver" of the sentence, observing that what constitutes a "just" punishment must be determined "in the light of [Zuk's] involuntary medical condition," and relying specifically on the rehabilitation purpose for sentencing set forth in § 3553(a)(2)(D). The court gave only passing attention to the other sentencing purposes identified in § 3553(a) and did so only when responding to the government's argument, stating simply:

> The government correctly refers to the importance of just punishment and respect for the law, the need for general deterrence, and the need to protect the

public. But the Court's sentence will address those concerns because the Court believes that it will largely reflect a respect for the law and emphasize the just punishment aspect wherein "just" must be considered in the light of the defendant's involuntary medical condition as diagnosed, and yet the sentence will provide considerable restraints on the defendant [through supervised release and the required participation in a treatment program] sufficient to protect the public.

In the end, the court emphasized that its sentence would serve "the treatment goals . . . under 18 U.S. Code 3553(a)(2)(D) [so that they] would not be defeated."

While sentencing is indeed discretionary, when a district court focuses so heavily on a single sentencing purpose only tangentially connected to a defendant's grave criminal misconduct, it risks abusing its discretion. *See United States v. Howard*, 773 F.3d 519, 531 (4th Cir. 2014) (holding that the "district court abused its discretion by focusing too heavily on [the defendant's] juvenile criminal history" and doing so "at the expense of a reasoned analysis of other pertinent factors"); *United States v. Engle*, 592 F.3d 495, 504 (4th Cir. 2010) (holding that the defendant's probationary sentence was substantively unreasonable where the district court rejected the Sentencing Guidelines' recommended sentence of 24 to 30 months' imprisonment because of its "near-exclusive focus" on the defendant's ability to pay restitution). And such an abuse becomes clearer if the object of the court's focus is questionably related to the defendant's criminal conduct. In contending that the district court focused too heavily on Zuk's autism spectrum disorder in this case, the government argues that the particular circumstances of Zuk's condition only marginally affected his criminal conduct and thus did not justify relieving Zuk from the

need for more serious punishment as consistent with the other § 3553(a) factors. We agree.

First, no expert testified that Zuk's medical condition caused his criminal conduct. Indeed, the record was undisputed that Zuk was highly functioning compared to most people with autism. He obtained the rank of Eagle Scout in high school; he made the Dean's List during his first semester of college; and he was not diagnosed with autism spectrum disorder until after his 2013 arrest. Indeed, before then, neither Zuk nor his family was even aware of his autism spectrum condition. Moreover, the experts never concluded that Zuk was less able to comprehend the possibility of a prison sentence as a consequence of his offense conduct or that he was unable to control his behavior. Zuk himself stated clearly and repeatedly that he knew what he was doing was both illegal and wrong and that he manipulated and lied because he knew he could get away with things.

While it was legitimate for the district court to consider Zuk's autism spectrum disorder as part of the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and to consider how his autism affected his rehabilitation needs, *id.* § 3553(a)(2)(D), we cannot conclude, based on the present record, that a time-served sentence based almost *exclusively* on these considerations was reasonable and adequately responded to the needs for punishment, deterrence, and respect for the law. This is especially true because Zuk's criminal conduct was so egregious.

Since the age of 16, Zuk had collected child pornography, favoring images depicting sadistic behavior with very young children. He traded images with others in an online community, including photographs of his younger sister in the nude and other young children being anally raped. In addition, on a daily basis during a six-month period, he communicated online with a 16-year-old boy about his sexual abuse of his 5-year-old cousin, even directing the 16-year-old to produce specific sadistic images of the cousin's abuse for Zuk's own sexual gratification. By the time of his arrest, Zuk had accumulated more than 13,800 images of child pornography and 472 videos, using more than 900 email addresses that he created to do so. Based on this undisputed evidence, Zuk could easily have been convicted on the six counts in the indictment charging him with transmitting and receiving child pornography, and the sentences for those counts could have been stacked to reach the recommended Guidelines' sentence of 324 to 405 months' imprisonment, manifesting well the extreme seriousness of Zuk's offenses. Zuk's conduct was thus far more serious than that required to convict him of simply possessing child pornography. Further informing the seriousness of Zuk's conduct is Congress's judgment, which we must respect, that *any* child pornography crime is a "serious offense[ ] deserving serious sanctions." *United States v. Hecht*, 470 F.3d 177, 182 (4th Cir. 2006) (citation omitted); *see also Morace*, 594 F.3d at 347, 350.

Thus, imposing a sentence for time served of 26 months primarily because of a diagnosis of mild autism hardly punishes, fails in a message of deterrence, does not adequately protect the public, and undoubtedly does not promote respect for the law. *See* § 3553(a)(2)(A)–(C).

The government also argues that the district court gave insufficient consideration to the question of whether its sentence for Zuk produced an unwarranted sentence disparity. Again, we conclude that the record supports this argument. Section 3553 requires that a district court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C.

§ 3553(a)(6). Although the court need not explain every disparity during sentencing, the disparity in this case was substantial. The uncontroverted evidence shows that defendants, like Zuk, with a Criminal History Category I who were sentenced under U.S.S.G. § 2G1.1 received an average sentence of 309 months' imprisonment and a median sentence of 240 months' imprisonment. In marked contrast, Zuk was sentenced to time served of 26 months. The record also shows that the 16-year-old boy with whom Zuk was communicating about abusing a 5-year-old child received a sentence in Texas state court of 50 years' imprisonment and that other members of his online community received sentences of 96 to 222 months' imprisonment. Indeed, persons sentenced with Criminal History Category I under the Guideline governing *simple possession* of pornography received an average sentence of 87 months' imprisonment and a median sentence of 72 months' imprisonment—roughly three times the length of the sentence imposed on Zuk. The magnitude of this disparity further supports our conclusion.

This is one of the rare cases where we conclude that the sentence imposed by the district court was substantively unreasonable in light of the § 3553(a) factors and therefore must be vacated. *See Rita*, 551 U.S. at 341, 127 S.Ct. 2456 (noting that courts of appeals must set aside sentences they find "unreasonable"). Zuk's sentence to time served of 26 months is simply below the bare minimum necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A). Accordingly, we vacate the sentence and remand for resentencing.

VACATED AND REMANDED